## Lisbon v. Clark.

If the legislature authorize the towns to pass a particular by-law, any form of words is sufficient to constitute such a by-law, by which the town, by a legal vote, intended to pass it.

It seems that the repeal of a statute which gives authority to the towns to pass a particular by-law will in general annul the by-law.

The Revised Statutes, in repealing the laws which gave such authority, and in reënacting them at the same time in the same forms, do not convey an expression of the legislative will to abrogate the by-laws passed under the preëxisting laws; they having been passed by towns in the exercise of a municipal power, which the legislature plainly intended to leave intact.

Debt. The plaintiffs alleged in their declaration that in the year 1841 they built two bridges across the river

Ammonoosuck, within the limits of Lisbon, at a cost of over $1,000 each, and opened them for the public travel; and on the second Tuesday of March, 1842, at their annual meeting, pursuant to an article inserted in the warning, which was, "to see if the town will vote to pass by-laws to impose a fine of one dollar on all persons riding or driving across the village bridge and the salmon-hole bridge, faster than a walk, agreeably to an act passed January 13, 1837, voted to collect fines of one dollar of all persons so offending, and on the 18th day of March caused boards, of the description required by the law, to be conspicuously posted upon either end of each bridge, where they remained. Yet the defendant, well knowing the premises, on the 26th day of August, 1844, drove a horse across the salmon-hole bridge, by which name one of the bridges was known, faster than a walk; whereby and by force of the statute and by-law the defendant has forfeited, and an action has accrued to the town to recover of the defendant the aforesaid sum of one dollar.

The plaintiffs afterwards amended, by adding a count to their declaration, in which, after reciting the erection of the bridges and the opening them for the public travel, as in the first count, they alleged that on the second Tuesday of March, 1844, at their annual meeting, pursuant to an article inserted in the warning, the town passed a by-law, imposing a fine of one dollar on every person who should ride or drive faster than a walk across the salmon-hole bridge, and erected the boards, as required by law, with the appropriate notices inscribed upon them. Yet the defendant, on the 26th day of August, 1844, well knowing the premises, &c., drove a horse across the salmon-hole bridge faster than a walk, contrary to the laws of the State and of said by-law, whereby and by force of said laws an action has accrued to the plaintiffs to have and recover of the defendant the sum of one dollar, &c.

In support of the action, and to show themselves

entitled to recover the penalty sought, the town gave in evidence the copy of a warrant, under the hands' of the selectmen of Lisbon, for a town meeting, to be holden in said town on the 8th of March, 1842, in which the fifth article was as follows: "To see if the town will vote to pass by-laws to impose a fine of one dollar on all persons riding or driving across the village bridge, and also the salmon-hole bridge, so called, in this town, faster than a walk, agreeably to an act of this State, passed January 13, 1837;" also copies of the following votes, passed at the aforesaid town meeting, namely:

"27. *Voted*, To collect fines of one dollar of all persons driving or riding across the village bridge or salmon-hole bridge, faster than a walk, agreeably to an act passed January 13, 1837.

"28. Chose D. R. Dexter to have the charge of the salmon-hole bridge, and to collect fines of those driving or riding over said bridge faster than a walk; Ezra Foster and William McIntire to assist D. R. Dexter in collecting fines."

The plaintiffs also gave in evidence the copy of a warrant for a town meeting in said Lisbon, under the hands of the selectmen, to be holden March 12, 1844, the second article in which was as follows: "To choose all necessary town officers for the year ensuing;" and the eleventh article in said warrant was as follows: "To pass by-laws and transact any other business thought proper when met." Also, copies of the following votes, passed at said last mentioned town meeting, namely:

"28. Motioned and voted, that Ezra Barrett be appointed to collect fines for riding or driving faster than a walk across the village bridge or the salmon-hole bridge."

"37. Motioned and voted, that Ezra Barrett select his own agents to assist him to collect fines for riding or driving across the village or salmon-hole bridges, contrary to by-laws."

To the sufficiency of the evidence to maintain the action, the defendant objected, for the following causes, namely:

1. Because the by-law, passed at the meeting holden on the 8th of March, 1842, was not authorized by statute, and it was also void for uncertainty.   The law of January 13, 1837, having been repealed by the act of December 23, 1842, the by-law aforesaid fell with it.

2. The by-law of March 12, 1844, is void, because, in the warrant for the meeting, the subject matter of the by-law is not distinctly stated, and no such by-law was authorized by statute; moreover, what is claimed to be a by-law of March 12, 1844, is not a by-law, but is merely an appointment of an agent to collect fines, and cannot be regarded as a by-law establishing a right to a penalty.

The plaintiff became nonsuit, by consent, subject to the opinion of the court upon the questions arising upon the foregoing evidence and exceptions.   Judgment is to be entered upon the nonsuit, or the nonsuit is to be taken off, and the action to be restored to the docket for trial, according to the opinion of the court upon the foregoing case.

*Morrison,* for the plaintiff, cited 5 Met. 400; 3 N. H. Rep. 474.

*Rand* and *Bellows,* for the defendant, cited 6 N. II. Rep. 332; 3 Pick. 462; 5 Pick. 44; 5 B. & P. 98; 2 M. & P. 164; 2 Chit. Pl. 402; 1 Pick. 154.

GILCHRIST, J.   The act of January 13, 1837, empowered towns, at their annual meetings, to establish by-laws to prevent all persons from riding or driving horses at a rate faster than a walk over any bridge within the limits of such town, which shall have cost $1,000 or over, and to annex penalties not over one dollar, &c.

In the warrant convening the annual town meeting of Lisbon in 1842, an article was inserted, "To see if the town will vote to pass by-laws to impose a fine of one dollar on all persons riding or driving across the village bridge, and also the salmon-hole bridge, so called, in this town, faster than a walk, agreeably to an act of this State, passed January 13, 1837."

At the town meeting the record shows that it was "Voted, to collect fines of one dollar of all persons riding or driving across the village bridge or salmon-hole bridge faster than a walk, agreeably to an act passed January 13, 1837."

It is apparent from this record that the question came regularly before the town, whether they would adopt by-laws to impose fines, in pursuance of the statute, upon persons who should improperly ride or drive across the bridges described in the warrant, and that they voted to do so, in terms that can admit of no mistake or doubt. It would therefore seem that the by-law was by that vote adopted. No particular form was prescribed by the statute in which the law should be engrossed, and there seems to be no law or custom restraining the town from selecting such form of expression as suits them, provided enough be contained to signify their will that the by-law exist, and to indicate the terms of it, and the objects to which it should apply ; and provided, further, that the by-law was authorized by law, and that the bridges were of a description, as to cost, to justify the application of the powers conferred upon the town for the protection of bridges. A great variety of forms may be found in the history of legislation for the expression of the legislative will, that have never been called in question, and that are as unlike to each other as the form used in this case is to any of them. We cannot entertain a doubt that a valid by-law existed by the vote of the town of Lisbon, at the annual meeting in 1842, and that the action is

well founded, unless subsequent events impaired the force and validity of the by-law. A question of more difficulty, if we attempt to solve it by the numerous canons of interpretation which the books contain, is as to the effect of the repealing chapter of the Revised Statutes, passed on the 23d day of December, 1842, upon the act of January 13, 1837; or, rather, upon this by-law, made in conformity with its provisions, and by force of the authority which it conferred.

It cannot be drawn in question, as a general proposition, that the repeal of a statute, by virtue of which a by-law has been enacted, involves also the repeal of the by-law itself, which is but a branch or an emanation from it. Whatever reason may be supposed to exist for the repeal of the statute, must also exist against the further duration of the by-law, which it was the special and sole object of the statute to bring into being and to sustain by legislative authority. This was said in substance in *Stevens* v. *Dimond*, 6 N. H. Rep. 332, and seems necessarily to be involved in the principle of all the cases which decide that, in pleading a by-law, the power to make it must be shown. Com. Dig., Pl., 2 W. 11; *Kirk* v. *Nowell*, 1 T. R. 118; *Vintner's Co.* v. *Passey*, 1 Bur. 235; *Commonwealth* v. *Worcester*, 3 Pick. 462.

It is also well settled, that, in general, when the entire provisions of a statute, or a system of laws, *in pari materiâ*, are reversed by a subsequent statute, those provisions are repealed by the latter act, upon the assumption that the legislature intended the enactment of an entirely new system, embracing the whole subject, and that an omission in the new of any provisions contained in the old, and the entire abrogation of the old, were contemplated. This reasonable doctrine was declared in *Leighton* v. *Walker*, 9 N. H. Rep. 59, upon the authority of numerous cases there cited.

The Revised Statutes, moreover, as has been said, repeal

in terms the act of January 13, 1837, upon which the by-law is founded. Rev. Stat., chap. 230. This compilation had for its object, in most of the provisions which it contains, not so much an alteration of the laws of the State, by repealing the old and enacting new and different laws, as a new and more convenient arrangement of the statutes then in force, with such alteration in the phraseology as might appear auxiliary to that object, and as might appear to favor the general end of perspicuity and certainty desirable in such cases. And these objects were pursued with an intention of not changing materially the meaning or effect of the statutes. Yet several changes were introduced, and, without any doubt, intended. In several cases beside the one now under discussion, the legislature, in pursuing the general design that has been adverted to, saw fit to repeal in terms the old law, and to reënact it, or to enact another in its precise terms, without making any provision against the ordinary effects of such repeal; these cases not falling within the general reservations contained in the repealing statute in favor of vested rights, or within the other exceptions, specified in the 5th and following sections of the 130th chapter.

In one of these cases the court have, in the construction of the law, attached to the repeal of the old statute the ordinary consequences of a repeal, and have held that the repeal of the statute of December 16, 1828, N. H. Laws 300, which gave a settlement to parties residing four years under certain conditions, prevented the acquiring of such settlement by a residence of three years before and one year after the passing of the Revised Statutes. The term of four years' continuous residence, and a law attaching the effect of a settlement to such residence did not coëxist; the continuity having been disturbed by the repeal, and not repaired by the reënactment of the statute at the same moment, and in the same terms. But pauper laws are *stricti juris*, by which is meant that there

are no rights in the case, for the claim of the pauper to municipal charity is not involved, and there are no considerations of admitted justice, or congruity even, that can intervene to found a presumption in favor of one town more than of another declining the burden of his support, or to require or to justify a reference to extrinsic matters to qualify the letter of the statute, or to aid in its interpretation.

No presumption, from such or any other extraneous circumstances, can be entertained that the legislature intended to prevent settlements from maturing by the completion of terms of residence, then in progress. So, on the contrary, no presumption so founded can exist of an intention to preserve such terms. The letter of the statute is the only guide in such a case, and we can take notice only that there has not been the residence required by existing laws. But such is not the case with regard to all statutes, and there are no better founded canons for their interpretation than some of those which require us to look beyond their mere literal expression, for the sure indication of the will of the legislature, which is the thing sought. *Heydon's Case*, 3 Co. 7.

What is the fair inference to be drawn, as to the intention of the legislature by the act of December 23, 1842, repealing the act of January 13, 1837, and at the same moment reënacting its provisions in the same phrase, with the addition only of a single word, and that word one that was necessarily implied by the former act, and of course not affecting the meaning of the substitute? If we assume for our guide the rules laid down in the case last referred to, and inquire, "What was the law before the making of the act, and what was the mischief and defect for which the law did not provide?" it is plain that the state of the law before the act was not such as required, in the judgment of the legislature, any remedy, since they reënacted it in its terms. The by-laws that

existed under it could scarcely have been considered by them a "disease of the commonwealth," since they clothed the towns with the power of passing the same by-laws.

Counsel have referred us to several other statutes of a similar character. The act of June 17, 1811, to authorize towns to make by-laws to prevent horses, mules, jacks, neat cattle and other animals, from going at large, (N. H. Laws 201), and the 13th section of the act of June 28, 1827, which authorized the inhabitants of the towns to make necessary rules, orders and by-laws for the directing, ordering and managing the prudential affairs of the town, &c., were reënacted in nearly the same terms by the Revised Statutes, chapter 31, sections 6 and 7, which, by chapter 230, repealed those laws.

Now if, by the repeal of these statutes and others like them, the legislature intended the abrogation of all the by-laws that had been made under them, which would be the ordinary effect of such repeal, they must have intended, by revising the statutes, that the towns would immediately assemble and revive the by-laws; for such, in most cases, might well be supposed to be their choice, and even their duty to do. That the legislature should have intended a result so idle, not to say perilous, to important interests existing under the protection of such by-laws, requires very plain and unequivocal expressions to establish in proof, and we cannot adopt a construction of their acts that would involve such consequences, without other evidence than any that has occurred to us that such is their meaning.

The statute in question was made for the purpose of enabling the towns, which are public municipal corporations, to enact a particular by-law, to protect from unreasonable use and unnecessary wear the expensive bridges which they are bound to keep in repair. This power to pass by-laws is an ordinary incident to corporations of that character. In some towns, boroughs, and like muni-

cipalities in England, it is possessed in much latitude, and has existed from so high antiquity as to make its origin a subject of debate. Com. Dig., By-Laws, A. B. C. ; Rand arg., *Commonwealth* v. *Worcester*, 3 Mass. 467 ; Com. Dig., Franchise, F, 10. Indeed, it may be said to be a power necessarily pertaining to corporations, without which it would be impossible, generally, to execute the objects for which they are founded.

Authority to pass by-laws was given by the act of the Province, in the 5 Geo. I., which provides " that the free-holders and inhabitants, qualified in any town meeting, orderly warned, according to the usage of such town, or the major part so assembled, or the major part of the selectmen, having instructions given them in writing by the town for that purpose, are empowered from time to time to make and agree upon such necessary rules, orders and by-laws, for the directing, managing and ordering the prudential affairs of such towns, as they shall judge most conducing to the peace, welfare, interest and good order of the town and inhabitants thereof, and to annex penal-ties for the observance of the same, not exceeding twenty shillings for one offence." Prov. Laws 138.

This provision, with slight alterations, has been incor-porated into the several statutes that have since existed, including that of 1791 and that of 1827, which has been referred to as having been repealed by the Revised Stat-utes. Other laws have been from time to time passed, conferring upon towns the power of making by-laws for special causes, and a body of by-laws has sprung up in various towns that have seen fit to avail themselves of these powers. These continue in force till repealed, either by the town in the exercise of its *quasi* legislative func-tion, in view of the exigence of its own particular case, or by the legislature itself, in the use of its higher discretion. *Stevens* v. *Dimond*, 6 N. H. Rep. 332.

The ordinary inducement for the legislature so to act

would be a sense of the general unfitness of the by-law, and the ordinary way to effect the abrogation of it would be to take away, by a general law, the power of the towns to make such. But it is obvious that the legislature would not be limited to that particular mode of proceeding, for they might do it by a general law in a more direct manner; and whatever act of the general court, possessing the form necessary to denote it to be such, should demonstrate the will of the legislature to be that the by-law should be annulled, would, without doubt, be sufficient to effect the purpose. But a formal repeal of all the laws by which the towns have, from a very early period, been authorized to pass by-laws, with a simultaneous reënactment of all those laws, indicates no intention whatever on the part of the legislature to deprive the towns of those very important elements of the municipal franchise. The act is otherwise fully and more satisfactorily accounted for as a part of a general design to reform the arrangement and phraseology of the statutes. The intention was evidently not to disturb the franchise of towns, but to leave them intact; and in leaving them intact to leave also inviolate and undisturbed all that had been done, and all that then existed under them.

There is no reason to suppose that the repeal of the laws in question was enacted by the legislature in the pursuance of any design to annul the by-laws, because there is a conclusive reason for supposing that they did not mean to disturb the powers of the town, but that the intention was to preserve and confirm them.

The conclusion, therefore, is that, viewing these revised statutes in connection with the circumstances under which they were enacted, as the evidence of the legislative will and intention, they do not furnish any indication of an intention to abrogate the by-laws of the towns, or any of them.

The nonsuit must, therefore, be stricken off, and the case remanded to the court of common pleas for trial.